FILED

2024 Mar-29  AM 10:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**WILLIE MOODY, JR.,** *et al.***,**
     Plaintiffs,

**v.**

**CIRCLE K STORES, INC.,** *et al.***,**
     Defendants.

Case No. 2:18-cv-435-CLM

## MEMORANDUM OPINION
## on CLASS CERTIFICATION

Plaintiffs seek class certification. The court **GRANTS** Plaintiffs' request to amend their class definition to this:

> All persons with mobility disabilities, who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, including those with difficulty walking or climbing stairs, who have accessed a company owned Circle K location since November 6, 2018, and on the basis of their disability encountered the interior architectural barrier consisting of the Schaerer Coffee Art Machines and/or coffee condiments that were out of reach range, and were therefore allegedly denied full and equal access to the goods and services at that location under Title III of the ADA.
>
> Excluded from the Class are Defendants, any person, firm, trust, corporation or other entity affiliated with the Defendants, and members of the federal judiciary.

(Doc. 194). The court **DENIES** Plaintiffs' motion to certify this class under Federal Rule of Civil Procedure 23. (Docs. 168, 194). The court explains both decisions below.

## BACKGROUND

Circle K Stores, Inc. is a chain of gas stations and convenience stores owned by Alimentation Couche-Tard, Inc. ("ACT"). (Doc. 155, ¶¶ 23-24). The four Plaintiffs have mobility disabilities that require the use of a wheelchair. (*Id.*, ¶ 3). As the class definition suggests, Plaintiffs want to represent a class of persons with mobility disabilities who cannot reach Schaerer Coffee Art Machines and coffee-related condiments inside Circle K stores. (Doc. 194).

### A. Circle K's business model

As explained later, Plaintiffs' inability to represent a class stems from the variations caused by Circle K's business model. Generally, ACT buys existing gas stations and convenience stores and rebrands them as Circle K. (*See* Doc. 155, ¶ 117). For example, in 2022, ACT bought and rebranded this Purple Cow convenience store with a Chevron gas station in Montgomery:



(Doc. 167-16 at 16). Because ACT buys stores designed and built by other companies, Circle K's come in many shapes and sizes, as seen in the distinct designs of seven Circle K stores visited by Plaintiffs:







Unique exteriors create unique interiors, as seen in the various layouts around the Schaerer Coffee Art Machines at issue:













(*See* Docs. 167-11, 167-12, 167-28, 170-1).

While this is now a putative class action focused on the nationwide placement of Schaerer coffee machines, the case started outside a single store with a single plaintiff. (*See* Doc. 1). The court recounts the six-year evolution of Plaintiffs' case below (a) because it's relevant to Plaintiffs' request to amend the class definition; and (b) it could help the Circuit Court decide whether to take an appeal from this order under Rule 23(f).

### B. First Complaint

The ADA prohibits places of public accommodation (like Circle K) from failing to remove architectural barriers to a disabled person's full and equal enjoyment of that place's goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b)(2)(B)(iv). Willie Moody sued Circle K in March 2018, alleging that a Kangaroo Express store in Irondale, Alabama (*i.e.,* Circle K Store 3805), failed to remove these barriers in violating of the ADA:

- The parking lot did not have a van accessible space with appropriate width or upright signage;
- Moody's path of travel into the store was inaccessible, in part because the store placed merchandise in the path;
- The slope on the wheelchair ramp was too great;
- The ramp lacked handrails; and,
- Moody could not use the drinking fountain because cleaning supplies blocked the knee and toe clearance.

(Doc. 1, ¶ 12). Moody asked for injunctive relief plus attorneys' costs and fees. (*Id.* at 12).

### C. The *Badger* Settlement

Circle K answered, in part, that Moody's architectural barrier claim was either moot or this court lacked jurisdiction to consider it because Circle K settled claims about architectural barriers in *Badger v. Circle K Stores, Inc.*, Civil Action No. 2:16-cv-01185 (W.D. Pa. June 6, 2017). (*See* Doc. 12, ¶¶ 12-13). Under that settlement, Circle K would spend $500,000 per year for 15 years to remediate ADA violations at all U.S. stores, including the alleged barriers at the Irondale store, and the Pennsylvania district court retained jurisdiction to monitor Circle K's compliance. (*Id.*). Further, if other cases (like this one) identified new stores with access barriers, those stores would be given priority on the remediation schedule. (*Id.*).

### D. Second Complaint and First Motion to Certify Class

In their Rule 26 report, the parties told the court that Circle K believed it had remedied most of the alleged violations at the Irondale store and that settlement was possible. (Doc. 20 at 5). So the court ordered the parties to meet at the Irondale store within three weeks and ordered Moody to amend his complaint three weeks after that, if needed. (Doc. 25). Circle K claims that it remedied the alleged barriers in Irondale soon after. (Doc. 30 at 1).

Even so, Moody timely asked to amend his complaint to add three "tester" plaintiffs (Jessica Harper, Dallas Weldon, and Grace Donaldson), one Defendant (Circle K's parent company, ACT), and class allegations stemming from Plaintiffs' experiences at 39 Circle K stores. (Doc. 26). Circle K opposed the amendment, reiterating its argument that the Pennsylvania court retained exclusive jurisdiction to deal with barrier remediation claims under the *Badger* settlement. (Doc. 30).

This court granted Moody's motion to amend because (a) in *Badger*, Circle K failed to settle with a class of Plaintiffs like Moody under Rule 23(e) and (b) Eleventh Circuit precedent required district courts to allow a new Plaintiff to file a similar lawsuit—despite a binding agreement/settlement—if the Plaintiff sought different relief he could not obtain from the existing settlement because he was not a party to the settlement. (*See* Doc. 34) (analyzing *Haynes v. Hooters of Am. LLC*, 893 F.3d 781 (11th Cir. 2018).

Plaintiffs filed their amended complaint the next day. (Doc. 36). In it, Plaintiffs alleged a host of additional indoor and outdoor violations—up to 13 violations at a single store—including:

- Some parking lots lacked a designated space for accessible vans;
- Some outdoor bagged ice coolers lacked the required clear maneuvering space;
- Some outdoor Redbox DVD-rental machines lacked the required clear maneuvering space; and,
- Most sales counters contained obstructions within the required clear width space.

(Doc. 36, ¶ 63). Among these, Plaintiffs added the first version of the claim now at issue: "the self-service beverage dispensers' operable parts exceeded maximum reach range requirements." (*Id.*)

The parties submitted a revised Rule 26(f) report in May 2019 (doc. 49); the case was reassigned to me in June; and the court met with the parties in July (doc. 53). Based on this meeting, the court gave the parties three months to mediate their remaining issues (*id.*)—a mediation period that grew into two-and-a-half years before settlement talks started to falter and Plaintiffs filed their first 'placeholder' motion to certify a class in December 2021. (Doc. 57).

Plaintiffs based their first motion to certify "solely upon the filed First Amended Complaint and the legal theories advanced therein." (*Id.* at 5, n.5). In it, Plaintiffs asked the court to certify this class:

> All persons with mobility disabilities who use wheelchairs or are otherwise disabled due to mobility-related issues, who were denied or will be denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any Circle K or Kangaroo Express convenience store in the United States on the basis of disability because of the presence of inaccessible parking, inaccessible sales counter(s), obstructed paths of travel, accessible elements without the minimum requisite clear floor or ground space, inaccessible self-service beverage dispensers, inaccessible self-service beverage machines or food service counters, inaccessible self-service shelves or dispensing devices for tableware, dishware, condiments, or self-service food items, or the failure to provide an accessible route connecting accessible elements, among other barriers.

(Doc. 57 at 4). Notice, Plaintiffs did not mention coffee machines in their first class definition, likely because Circle K rolled the Schaerer brand coffee machines into stores during the failed mediation period. (*See* Doc. 36).

### E. Schaerer Coffee Art Machines

When Moody first sued Circle K in May 2018, Circle K was testing three coffee machines for possible rollout across Circle K stores. (Doc. 167-7 at 10). Circle K ultimately chose these 'bean-to-cup' Schaerer Coffee Art Machines:



(Doc. 167-11 at 8). Circle K left it up to regional business units to decide if they wanted to swap machines; where to place the machines; and, how the regional business units would pay for the machines. (Doc. 167-7 at 35, 39-43). Schaerer and its third-party contractors installed the machines, usually on top of existing countertops. (Docs. 167-8, 170-20). Plaintiffs allege that Circle K added more than 14,500 Schaerer machines to 90% of Circle K's approximately 7,000 American stores from June 2018 through September 2022. (Doc. 168 at 1, 3; *see also* Doc. 155-10 (spreadsheet listing installed machines)).

The Schaerer machines allow customers to fresh brew their coffee by touching buttons on a digital screen. (*See* Doc. 167-11). Plaintiffs claim that persons in a wheelchair cannot reach the buttons and thus cannot use the machines. (*See* Doc. 155, ¶ 46). The 2010 Americans with Disabilities Act Accessibility Guidelines Standards ("ADAAG") require that the buttons be no higher than (a) 48" from the ground if the machine is set back less than 20" from the counter's edge and (b) 44" from the ground if the machine is set between 20" and 25" from the ground:



*See* 2010 ADA STANDARDS FOR ACCESSIBLE DESIGN § 308 (Dep't of Justice 2010). The lower buttons are about 16 inches above the countertop, with the upper buttons being two inches above the lowers:



(Doc. 167-11 at 35 (Plaintiffs' submission)). Placing a Schaerer machine on a 30" countertop thus results in lower buttons being about 46 inches from the ground and upper buttons being about 48 inches from the ground. That means countertops taller than 30 inches risk violating the 2010 reach standards.

**F. Class Certification Discovery, Substitute Plaintiff, and Second Motion to Certify a Class**

With settlement talks failing, and Plaintiffs filing their first motion to certify a class as a placeholder, the court and parties focused on class certification discovery and motions practice in 2022. (*See* Doc. 71 (schedule)). While coffee machines were not mentioned in Plaintiffs' placeholder motion (doc. 57), it became clear during discovery that the height of Schaerer coffee machines would be a primary focus in Plaintiffs' case.

Indeed, when Plaintiffs filed their Renewed Motion for Class Certification at the close of class certification discovery (doc. 97), the Schaerer coffee machines were the main focus of Plaintiffs' narrative (*id.* at 14-16) and one of Plaintiffs' proposed common questions of law and fact:

> Whether Circle K's installation of the Coffee Art machines at 90% of its locations constituted an 'alteration' within the meaning of 28 CFR § 36402.(b), and; whether their installation complies with the 2010 Standards; and, whether their placement on a 34 inch counter has a disparate impact upon people in wheelchairs?

(Doc. 97 at 33). Plus, one month after filing the Renewed Motion, Plaintiffs asked the court to allow them to replace Plaintiff Grace Donaldson with Bob Lujano because Lujano could testify about his inability to reach the Schaerer coffee machine buttons, coffee lids, and coffee cups. (Doc. 112, ¶ 5).

That said, Plaintiffs' proposed class definition (their second) did not limit the class to persons injured by Circle K's placement of coffee machines. (*See* Doc. 97). Rather, Plaintiffs again painted with a broad brush:

> All persons with mobility disabilities, who have difficulty walking, climbing stairs, or who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, who have accessed, or attempted to access a company owned Circle K location since 2018, and (1) who have encountered an exterior barrier on the basis of their disability such as inaccessible parking; lack of signage or striping with parking; and an excessive slope; or, (2) who have encountered an interior barrier on the basis of their disability such as inaccessible sales counter(s),

> inaccessible selfservice beverage dispensers; inaccessible self-service beverage machines or food service counters; inaccessible self-service shelves or dispensing devices for tableware, dishware, condiments, or selfservice food items; or an inaccessible bathroom; and were therefore allegedly being denied access under Title III of the ADA at those locations.

(*Id.* at 28-29).

### G. Third Complaint and Third Motion to Certify a Class

The court could not rule on Plaintiffs' second motion to certify a class (doc. 97), however, because of ongoing discovery and substitution disputes. (*See* Docs. 98-103, 105, 110, 116-17, 121, 124-25, 128, and 133). The court held two hearings (March 2 and March 7, 2023) to clean up the outstanding issues. (*See* Docs. 131, 132). After the hearings, the court granted Plaintiffs' motion to add Mr. Lujano; extended the class certification discovery period; and gave Plaintiffs another chance to amend their complaint and renew their motion to certify a class based on a final round of class certification discovery that focused heavily on coffee machines. (*See* Docs. 131, 132, 137).

The court held three more conferences during the extended discovery period to address continued coffee machine-related issues. (Docs. 153, 154, 157). For example, the court and parties discussed how to collect evidence on countertop height, with the court suggesting pictures of a tape measure next to countertops—some of which appear in this opinion. (Doc. 153 at 20).

1. Operative Complaint (doc 155): When discovery closed, Plaintiffs filed their Second Amended Class Action Complaint, the operative complaint. (Doc. 155). In their background section, Plaintiffs spent 54 paragraphs describing Circle K's coffee machines—far more space than Plaintiffs spent on any other alleged barrier. (*Id.*, ¶¶ 52-102, 134-36).

That said, Plaintiffs alleged 22 distinct types of barriers; six related to parking, eight related to routing, and eight related to the store. (*Id.*, ¶ 116). Plaintiffs included a chart of the alleged barriers encountered at 39 stores—a chart the court will paste below when discussing the motion hearing. (*Id.*, ¶ 117).

Plaintiffs allege three counts, the first two under the ADA and the third under the court's equitable authority:

- **Count I** alleges that Circle K and ACT failed to remove the barrier created by the Schaerer coffee machines, plus all of the barriers listed in the chart of 39 stores (*id.*, ¶ 117), in violation of 42 U.S.C. § 12182(b)(2)(A)(iv).

- **Count II** alleges that Circle K and ACT failed to modify policies, practices, and procedures that led to the architectural barriers mentioned in Count I, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii).

- **Count III** alleges that, because the installation of Schaerer Coffee Machines was an alteration under the ADA, Circle K and ACT were required to spend—but did not spend—a certain amount of money remediating the path of travel to the coffee machines. Plaintiffs ask the court to disgorge Circle K and ACT of the amount of money they should have spent and put that money in a trust.

(*Id.*, ¶¶ 155-68). On the same day this order is entered, the court will enter an order dismissing Counts II and III with prejudice. (Docs. 201, 202). So only Count I remains.

2. <u>Operative Motion to Certify a Class</u>: Plaintiffs also filed a Renewed Motion for Class Certification, the motion at issue here. (Doc. 168). Plaintiffs asked the court to certify this class:

> All persons with mobility disabilities, who have difficulty walking, climbing stairs, or who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, who have accessed, or attempted to access a company owned Circle K location since 2018, and (1) who have encountered an exterior barrier on the basis of their disability such as inaccessible parking; lack of signage or striping with parking; and an excessive slope; or, (2) who have encountered an interior barrier on the basis of their disability such as inaccessible self-service beverage dispensers, including but not limited to the Schaerer Coffee Art machines; inaccessible self-service food service counters; inaccessible selfservice shelves or dispensing devices for

> tableware, dishware, condiments, or self-service food items; or inaccessible restroom facilities; and were therefore allegedly being denied equal access under Title III of the ADA at those locations.
>
> Excluded from the Class are Defendants, any person, firm, trust, corporation or other entity affiliated with the Defendants, and members of the federal judiciary.

(Doc. 168 at 27-28). To establish commonality, Plaintiffs say that common, class-wide evidence will answer these 11 common questions of law and fact:

> Whether Defendants' installation of the SCAMs at over 90% of their stores created a common architectural barrier by failing to comply with the reach range requirements of the 2010 Standards?
>
> Whether Defendants' installation of the SCAMs constituted an 'alteration' within the meaning of 28 C.F.R. § 36.402?
>
> Whether Defendants' installation of the SCAMs occurred in 'an area of primary function' that triggered "path of travel' remediation obligations?'
>
> Whether Defendants ever performed their ADA mandated 'path of travel' remediation obligations?
>
> Whether the ADA practices of Defendants' BUs are deficient in identifying and fulfilling their ADA barrier removal obligations?
>
> Whether Defendants should be required pursuant to 28 C.F.R. § 36.302 (a) to make reasonable modifications in policies, practices, or procedures, when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities?
>
> Whether Plaintiffs can carry their initial burden of proof of showing that barrier removal is readily achievable, within the meaning of 28 C.F.R. § 36.304 (a) at Defendants' stores?
> Whether Defendants can rebut Plaintiffs' initial burden on barrier removal being 'readily achievable?'

> Whether Circle K has 'operated under a general [unwritten] policy of discrimination' towards the mobility disabled?
>
> Whether Defendants' refusal to implement the BSA provides direct evidence Defendants 'operated under a general [unwritten] policy of discrimination' towards the mobility disabled?
>
> Whether Defendants 'practice' of delegating to the BUs their responsibility for ADA compliance, furthers this [unwritten] policy of discrimination?

(*Id.* at 168).

### H. Oral Argument & Proposed Class Definition

The court heard argument on November 8, 2023. (Doc. 193 (transcript)). During the argument, the court displayed a portion of the chart from Plaintiffs' operative complaint and questioned counsel how the court could find commonality when (a) the proposed class definition pleaded the 22 architectural barriers in the disjunctive and (b) Plaintiffs' chart alleged that only 2 of the 39 stores shared the same barriers—likely meaning that there was no barrier (and thus no ADA violation) common to Circle K stores.



(Doc. 193 at 20-21). Plaintiffs' counsel promptly suggested they could "tweak" the class definition to address the court's commonality concern. (*Id.* at 21, 24).

Based on counsel's assertion that Plaintiffs could amend the class definition to achieve commonality, the court ordered Plaintiffs to submit (a) their proposal for a new class definition, (b) a list of common questions of law or fact that satisfy Rule 23(a)(2), (c) how the proposed definition would meet the rest of Rule 23(a) and 23(b)'s requirements, and (d) whether good cause existed to allow a fourth class definition. (Doc. 190).

In response, Plaintiffs asked the court to certify the following coffee-focused class:

> All persons with mobility disabilities, who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, including those with difficulty walking or climbing stairs, who have accessed a company owned Circle K location since November 6, 2018, and on the basis of their disability encountered the interior architectural barrier consisting of the Schaerer Coffee Art Machines and/or coffee condiments that were out of reach range, and were therefore allegedly denied full and equal access to the goods and services at that location under Title III of the ADA.
>
> Excluded from the Class are Defendants, any person, firm, trust, corporation or other entity affiliated with the Defendants, and members of the federal judiciary.

(Doc. 194). Plaintiffs then listed these eight questions of law or fact as ones that would satisfy Rule 23(a)(2)'s commonality requirement:

> Beginning in 2018 up through the present, did the Defendants have or engage in an unofficial policy of disregarding the reach range requirements for operable parts, contained in §§308 and 309.2 of the 2010 Standards, when they installed the SCAMs in their company owned locations?
>
> Beginning in 2018 up through the present, did the Defendants have or engage in a practice of disregarding the reach range

requirements for operable parts, contained in §§308 and 309.2 of the 2010 Standards, when they installed the SCAMs in their company owned locations?

Beginning in 2018 up through the present, did the Defendants' installation of SCAMs that disregarded the reach range requirements for operable parts contained in §§308 and 309.2 of the 2010 Standards, create a common architectural barrier for purposes of the ADA?

Did the Defendants' policy, practice, or procedure of relying upon Schaerer to install the SCAMs lead to the creation of the common architectural barrier?

Did the Defendants' installation of SCAMs, in replacement of the existing drip coffee brewers at their locations, constitute an "alteration" as that term is understood for purposes of 28 C.F.R. § 36.402(b)?

When installing the SCAMs, did Defendants disregard 28 C.F.R. 36.402(a)(1) which requires that any alteration "be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs?

If the "alteration" occurred in an "area of primary function," did 28 C.F.R. 36.403 require Defendants to undertake separate "path of travel" remediation obligations that they never performed?

Are the Defendants' assertions of "alternative accommodation" or "equivalent facilitation," a defense under the ADA for disregarding the reach range requirements for operable parts of the 2010 Standards when installing SCAMs?

(*Id.* at 5-6).

—

Based on this history, the court must answer two questions. First, what class definition must the court consider: the definition in Plaintiffs' Renewed Motion for Class Certification (doc. 168) or the amended definition Plaintiffs

requested during and after the hearing (doc. 194)? Second, have Plaintiffs met Rule 23's requirements to certify the chosen class?

<h2 style="text-align:center">STANDARD OF REVIEW</h2>

To certify a class, the class representative "must have standing and the putative class must satisfy both the requirements of Federal Rule of Civil Procedure 23(a) and the requirements found in one of the subsections of Rule 23(b)." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019) (footnote omitted). "The party *seeking* class certification has the burden of proof," *Brown v. Electrolux Home Products, Inc.*, 817 F3d 1225, 1233 (11th Cir. 2016), and the court makes no inferences on that party's behalf. *Id.* "[I]f doubts remain about whether the standard is satisfied, the party with the burden of proof loses." *Id.; see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (requiring a "rigorous analysis" before certifying a class).

<h2 style="text-align:center">DISCUSSION</h2>

## A. Amending the Class Definition

The court must first decide whether to grant Plaintiffs' request to amend the class definition and corresponding questions of fact and law. (Doc. 194).

1. <u>The standard</u>: Rule 23 does not dictate when a party seeking class certification is allowed or prohibited from amending his proposed definition. Instead, Rule 23(c)(1)(A) tells the district court to decide certification "at an early practicable time after a person sues or is sued as a class representative," yet gives the court authority to alter its own order granting or denying class certification up until final judgment. *See* FED. R. CIV. P. 23(c)(1)(C).

The Circuit Court has gone both ways, depending on the circumstances. The Court has found (in an unpublished opinion) that a district court did not abuse its discretion by refusing to allow an amendment after the time to amend had expired under local rules and the amendment could "further delay the disposition of this case." *Walewski v. Zenimax Media, Inc.*, 502 Fed. App'x 857, 861 (11th Cir. 2012). But the Court found that a district court did abuse its discretion when it denied a class certification motion as untimely when the court had not set a certification deadline and Plaintiffs' filing did not prejudice any party. *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1368 (11th Cir. 2021). The

21

Circuit Court has also said that it will "err on the side of allowing the district court an opportunity to fine-tune its class certification order rather than opening the door too widely to interlocutory appellate review" under Rule 23(f). *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1274 (11th Cir. 2000).

In short, the court has discretion to rule either way, as long as it balances Rule 23(c)'s lengthy grant of power with the court's responsibility to timely resolve a case. *See* 3 NEWBERG ON CLASS ACTIONS § 7.5 (6th ed. Nov. 2023 update) ("In sum, courts retain significant discretion under the 'at an early practicable time' formulation of Rule 23 and are authorized to excuse seemingly tardy certification motions in appropriate circumstances.").

2. <u>Discussion</u>: Defendants note that Plaintiffs have been given six years and three chances to refine their definition, including the re-opening of certification discovery followed by the chance to re-plead Plaintiffs' motion for class certification on a certain date. As explained below, the court has no intention of allowing another amendment after today. *See infra* Part C. But the court weighs more heavily Plaintiffs' arguments that (a) this case was headed toward a coffee machine-based class definition long before Plaintiffs asked to amend the definition and (b) Defendants suffer no prejudice from the court deciding whether to certify a *narrower* class based on the same evidence. The court therefore **grants** Plaintiffs' request to amend the class definition to this:

> All persons with mobility disabilities, who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, including those with difficulty walking or climbing stairs, who have accessed a company owned Circle K location since November 6, 2018, and on the basis of their disability encountered the interior architectural barrier consisting of the Schaerer Coffee Art Machines and/or coffee condiments that were out of reach range, and were therefore allegedly denied full and equal access to the goods and services at that location under Title III of the ADA.

> Excluded from the Class are Defendants, any person, firm, trust, corporation or other entity affiliated with the Defendants, and members of the federal judiciary.

(Doc. 194). In Part B, the court will determine whether Plaintiffs met their burden to establish this class under Rules 23(a) and 23(b). Then, in Part C, the court will explain why—absent a showing of legal error in this order—it will not entertain another motion to amend the proposed class.

## B. Certifying the Revised Class

Plaintiffs must establish three things before the court will certify a class and appoint class counsel: (1) at least one class representative has standing; (2) all four requirements of Rule 23(a) are met; and (3) the action falls within one of the three types of actions listed in Rule 23(b). *See Cordoba*, 942 F.3d at 1267. Defendants argue that Plaintiffs fail on all three. Because Defendants' standing argument challenges the court's jurisdiction, the court starts there.

### 1. Article III Standing

Rule 23(a) says that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members[.]" So before the court can certify a class, at least one of the four named Plaintiffs must have Article III standing to raise a claim that Circle K's placement of coffee machines or coffee condiments out of reach range violates the ADA. *See Prado-Steiman*, 221 F.3d at 1279 ("[P]rior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim."). To have Article III standing, a plaintiff must show: (1) he has suffered an injury in fact; (2) the injury is fairly traceable to conduct of the defendant; and, (3) a favorable decision would redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Defendants challenge Plaintiffs' standing in two ways. First, in a factual challenge, Defendants argue that "[c]lass discovery has shown that Plaintiffs did not suffer an injury in fact, and therefore do not have standing." (Doc. 169 at 10). Second, Defendants argue that even if Plaintiffs have standing to sue the individual stores they visited, "Plaintiffs—who each have only visited a handful (mostly in Alabama) of Circle K's over 4,000 stores—do not have

standing to seek injunctive relief regarding Circle K's other stores across the country." (Doc. 197 at 13). The court addresses both attacks below.

### A. Injury in Fact (factual challenge)[1]

An ADA tester plaintiff is injured "when he encounters architectural barriers that discriminate against him on the basis of his disability." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013) (citing 42 U.S.C. § 12182(b)(2)(A)(iv)). That plaintiff has standing to seek injunctive relief (*i.e.*, the removal of the barrier) if he returned, attempted to return, or intends to return to the store with the discriminatory barrier. *Id.* at 1336.

Plaintiff Weldon testified that he and his fiancée often refuel their car at the Circle K in Opelika, Alabama. (Doc. 167-22 at 89). Weldon testified that, when his fiancée pumps the gas, he goes into the store to buy chips and drinks. Weldon testified that while he doesn't like coffee, his fiancée does. (*Id.*). So Weldon tries to buy her coffee when she pumps gas. (*Id.*). But Weldon cannot buy coffee at the Opelika Circle K because the buttons on these digital screens are too high for him to reach:

---

[1] Defendants base their factual challenge on a *facial* assumption—*i.e.*, that "Lujano is the only Plaintiff who brought a coffee machine claim," so the court should only look at facts about Lujano. (Doc. 197 at 13). Defendants' limitation is wrong for two reasons. First, while Plaintiffs could have been more specific, the operative complaint alleges that all four Plaintiffs encountered "inaccessible self-service beverage dispensers" at a Circle K store. (*See* Doc. 155, ¶¶ 104 (Moody), 106 (Weldon), 108 (Harper), 110 (Lujano)). Second, and more importantly, because Defendants base their challenge on facts produced in discovery (*i.e.*, deposition testimony)—rather than the facts pleaded in the complaint—the court looks outside the complaint to all extrinsic evidence, and it is "free to weigh the facts" free of Rule 12's standards. *Houston v. Marod Supermarkets*, 733 F.3d 1323, 1335-36 (11th Cir. 2013).

 

(*Id.* at 88-92 (deposition testimony); Docs 167-11; 167-33 (photos)). So Weldon's fiancée had to push the buttons to make the coffee after she finished pumping gas. (Doc. 167-22 at 91).

If proved true, Weldon suffered an injury in fact when he could not reach the buttons, while a person without a mobility disability could reach the buttons.[2] *See Houston*, 733 F.3d at 1332. Circle K's placement of the Schaerer coffee machine caused this injury (*i.e.*, traceability), which could be cured by an injunction that required Circle K to add buttons within the appropriate reach range (*i.e.,* redressability). As a result, Weldon has standing to pursue Count I, which alleges that Circle K violated 42 U.S.C. § 12182(b)(2)(A)(iv) when it failed to remove the architectural barrier created by Schaerer coffee machines with buttons that violate ADA reach range standards. Weldon also has standing to seek injunctive relief because Weldon testified that he has been to the Opelika Circle K more than 50 times and he goes on a monthly or bi-weekly basis. (Doc. 167-22 at 88-89).

Because at least one named Plaintiff has Article III standing to pursue Count I, the court rejects Defendants' argument that Plaintiffs lack standing to certify a class based on that claim. *See Prado-Steiman*, 221 F.3d at 1279 (only one named Plaintiff needs to establish standing).

---

[2] Weldon also testified that he could reach a coffee machine that was "55 inches or lower." (Doc. 167-22 at 91-92). Whether this discredits his testimony that he could not reach the Schaerer machine is a question of fact for trial, not the threshold issue of standing.

### B. Standing for stores not visited

The court also rejects Defendants' argument that class standing is limited to the stores visited by the named Plaintiffs. (Doc. 197 at 13). Surely, the four named Plaintiffs do not have *individual* standing to sue for injuries suffered at Circle K stores they have not visited. But this point confuses Article III standing with class representation under Rule 23. *See* NEWBERG ON CLASS ACTIONS § 2:6 ("[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether, and to what extent, the plaintiff may serve in a representative capacity on behalf of the class.").

"[C]lass representative standing does not necessarily require that the class representative suffer injury at the same place and on the same day as the class members. Rather, it requires that the named plaintiff and class members have the same interest and suffer the 'same injury.'" *Fox v. Ritz-Carlton Hotel Co., LLC,* 977 F.3d 1039, 1047 (11th Cir. 2020) (quoting *Prado-Steiman*, 221 F.3d at 1279). Plaintiff Weldon shares the same interest with the other named Plaintiffs and absent class members—*i.e.*, fair and equal access to Circle K's public accommodations. They also share the same (alleged) injury—*i.e.*, the inability to reach coffee machines that can be reached by persons without mobility disabilities.

So the named Plaintiffs needn't travel to every Circle K store across America to represent a class of persons with the same interest and injury. If that were the case, we'd have no class actions. Rather, Plaintiffs need to meet the requirements of Rule 23(a) and 23(b). *Fox*, 977 F.3d at 1047 (the named Plaintiff could represent a class of persons who were wrongly charged an automatic gratuity at Ritz-Carlton restaurants, even though he visited only one of the 49 restaurants in Florida); *see also Mielo v. Stake 'N Shake Ops., Inc.*, 897 F.3d 467, 480 (3d. Cir. 2018) (finding that plaintiffs with mobility disabilities had standing to seek class injunctive relief against 417 Steak 'N Shake restaurants despite only visiting two of the 417).

—

The court's holding is limited: Plaintiffs have provided enough evidence to demonstrate that at least one Plaintiff has standing, meaning the court has subject-matter jurisdiction. The court does not decide or opine whether Plaintiffs' evidence proves an ADA violation or an injury.

### 2. Rule 23(a) Prerequisites

Rule 23(a) has four explicit requirements: "numerosity, commonality, typicality, and adequate representation." *Dukes*, 564 U.S. at 349. District courts must perform a "rigorous analysis" of all four prerequisites before certifying a class. *Id.* at 351. So the court will address each prerequisite below, in the order they appear in the rule. That said, the court's most rigorous analysis will be commonality (Rule 23(a)(2)) because it is the prerequisite that Plaintiffs seem doomed to fail no matter how they redefine the class. As explained, thanks to (a) the lack of a discriminatory corporate policy governing the height of coffee machines and (b) the variations in countertops and store layouts among Circle K's 7,000 stores, no common answer "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

### A. Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires proof that "the class is so numerous that joinder of all members is impracticable." *Id.* ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties[.]"). In this Circuit, proof that there are 40 class members is enough; 21 members is not enough; and anything in between 21 and 40 is "open to judgment based on other factors." *Vega v. T-Mobile*, 564 F.3d 1256, 1267 (11th Cir. 2009) (citing *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see also* NEWBURG ON CLASS ACTIONS § 3:12 ("As a general guideline, however, a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder, while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.").

1. <u>Plaintiffs' evidence</u>: As discussed, Plaintiff Weldon testified that he could not reach a Schaerer coffee machine at an Opelika, Alabama Circle K store. (Doc. 167-22 at 89-92). While he offered less details than Weldon, Plaintiff Moody testified that someone at a Circle K store (either an employee or store manager) had to get coffee for him as well. (Doc. 167-23 at 180-181). Plaintiffs offer declarations from 10 other persons with a mobility disability

who say they also unsuccessfully tried to get coffee from one of Circle K's self-serve machines:

- Bob Lujano, Birmingham, Alabama;
- Shelly Loose, Byron Center, Michigan;
- Amy Bleile, Chicago, Illinois;
- Dianna Warren, Canton, Ohio;
- Joanna Butler, Grassville, Arkansas;
- Beth Boyanton, Birmingham, Alabama;
- Dean Rothman, Sylacauga, Alabama;
- Ida Sazama, Clarksville, Tennessee;
- Steve Gregory, Vestavia Hills, Alabama; and,
- Sylvia Longmire, Sanford, Florida.

(Doc. 167-85). Adding these 10 declarants to Plaintiffs Weldon and Moody makes 12 putative class members.[3]

Twelve people, of course, is less than the 21-person threshold. *Vega*, 564 F.3d at 1267. So Plaintiffs also rely on inferences created by statistics. First, Plaintiffs submit a report from Dr. Alan Seals that collects Census Bureau data for persons with ambulatory difficulties, broken into geographic regions that have Circle K stores:

---

[3] While the court counts Plaintiff Lujano as one of the 12 based on the definitive nature of his December 5, 2022 declaration (docs. 98-27 at 2; 167-35 at 3), the court notes that Lujano could not recall these events when deposed in May 2023 (doc. 170-5 at 110-12).

| Table 2: Distribution of Ambulatory Disabled Population by Metro | | | |
|---|---|---|---|
| Metro Area | Ambulatory Disabled Pop | Total Pop | Fraction of Ambulatory Disabled |
| Albuquerque, NM | 65814 | 889272 | 0.074 |
| Atlanta-Sandy Springs-Roswell, GA | 298897 | 5833329 | 0.051 |
| Birmingham-Hoover, AL | 99670 | 1114754 | 0.089 |
| Boston-Cambridge-Newton, MA-NH | 236733 | 4741784 | 0.050 |
| Charleston-North Charleston, SC | 46996 | 774119 | 0.061 |
| Charlotte-Concord-Gastonia, NC-SC | 143456 | 2561500 | 0.056 |
| Chicago-Naperville-Elgin, IL-IN-WI | 482767 | 9271667 | 0.052 |
| Columbia, SC | 57961 | 797897 | 0.073 |
| Columbus, OH | 109291 | 1951329 | 0.056 |
| Dallas-Fort Worth-Arlington, TX | 333091 | 7303037 | 0.046 |
| Denver-Aurora-Lakewood, CO | 127090 | 2982852 | 0.043 |
| Detroit-Warren-Dearborn, MI | 306933 | 4183348 | 0.073 |
| El Paso, TX | 55765 | 822258 | 0.068 |
| Houston-The Woodlands-Sugar Land, TX | 317920 | 6821452 | 0.047 |
| Indianapolis-Carmel-Anderson, IN | 120122 | 2013696 | 0.060 |
| Jacksonville, FL | 99921 | 1473113 | 0.068 |
| Los Angeles-Long Beach-Anaheim, CA | 660322 | 13000000 | 0.051 |
| Miami-Fort Lauderdale-West Palm Beach, FL | 357203 | 6015475 | 0.059 |
| Nashville-Davidson--Murfreesboro--Franklin, TN | 125505 | 2033530 | 0.062 |
| New York-Newark-Jersey City, NY-NJ-PA | 1098197 | 19500000 | 0.056 |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | 392301 | 5970323 | 0.066 |
| Phoenix-Mesa-Scottsdale, AZ | 271345 | 4767337 | 0.057 |
| Raleigh, NC | 72879 | 1394417 | 0.052 |
| St. Louis, MO-IL | 190269 | 2777815 | 0.068 |
| San Antonio-New Braunfels, TX | 171555 | 2393738 | 0.072 |
| San Diego-Carlsbad, CA | 157998 | 3232647 | 0.049 |
| San Francisco-Oakland-Hayward, CA | 214821 | 4630241 | 0.046 |
| Seattle-Tacoma-Bellevue, WA | 192406 | 3859719 | 0.050 |
| Tampa-St. Petersburg-Clearwater, FL | 238289 | 3103603 | 0.077 |
| Tucson, AZ | 76703 | 1008140 | 0.076 |
| Virginia Beach-Norfolk-Newport News, VA-NC | 102018 | 1605089 | 0.064 |
| Population Totals and Avg.Fraction of Population Ambulatory Disabled | 7224238 | 128827481 | 0.060 |

Source: 5-year American Community Survey, 2016-2020.  Variable: DIFFPHYS--indicates whether the respondent has a condition that substantially limits one or more basic physical activities, such as walking, climbing stairs, reaching, lifting, or carrying.

(Doc. 81-3). This chart suggests over 7.2 million ambulatory disabled persons live in an area with a Circle K. Dr. Seals' ultimate figure tops 11.5 million. (*Id.* at 17). Next, Plaintiffs point to a 2018 Department of Transportation study that shows about 25.5 million Americans have a disability that makes travel outside the home difficult. (Doc. 155-1). Over half (57.8%) use a medical device, and 19.9% of these persons use a wheelchair or scooter. (*Id.* at 3). While some persons with mobility disabilities do not leave their homes, and those who do make fewer trips per day on average (2.6 versus 3.6), mobility disabled adults travel just as often for "shopping and errand trips." (*Id.* at 6).

2. <u>Standard</u>: Whether Plaintiffs meet their burden comes down to whether the court can make reasonable inferences from circumstantial statistical evidence. Plaintiffs have declarations or testimony from 12 persons who would fit into the class (doc. 167-85), and they present evidence that suggests over 800,000 more persons *could* fit (docs 81-3; 155-1). Plaintiffs'

combined numbers suggest that at least 7.2 million ambulatory disabled persons live in a geographic region with a Circle K; 57.8% use some medical device; and 19.9% of those persons use a scooter or wheelchair. That means Plaintiffs offer evidence that about 828,158 persons who use a wheelchair or scooter live in an area with a Circle K.

Defendants argue that Plaintiffs present no evidence how many of those 800,000+ persons (a) shop at Circle K, (b) for coffee, but (c) cannot reach the buttons on a Schaerer coffee machine. (Doc. 168 at 32). But that's only part true; Plaintiffs have shown that at least 12 persons (two named Plaintiffs and 10 Declarants) fit all three categories. (*See* Doc. 167-85). Defendants are right, though, that the court must speculate that 28 out of 828,158 (0.00338%) of these potential class members are like the two named Plaintiffs and 10 Declarants that Plaintiffs' counsel have uncovered so far. (Adding 28 to the 12 known members would equal the 40 persons that automatically satisfies numerosity under Eleventh Circuit precedent.).

That invites the question: Can the court speculate based on stats, in light of known class members? Unfortunately, there's no clear answer.

Plaintiffs say that "[w]hen the exact number of class members cannot be ascertained, the court may make 'common sense assumptions' to support a finding of numerosity. *Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983)." (Doc. 194 at 6). If the Eleventh Circuit said that in *Evans*, this issue would be easy. But it didn't. The "common sense assumptions" quote does not appear in *Evans*; it comes from a Fifth Circuit case, *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981), which in turn took the phrase from Newburg's treatise on class actions. *Id.* (quoting NEWBERG ON CLASS ACTIONS § 8812 (5th ed. 1977)). *Zeidman* and the cited Newburg section both dealt with assumptions made on behalf of shareholders and traders, not ADA plaintiffs. *Id.* A Westlaw search suggests that the Eleventh Circuit has never said that district courts can use "common sense" or "common sense assumptions" when conducting its Rule 23(a)(1) numerosity analysis.[4] Nor has it said we cannot.

---

[4] Both parties cited cases or the record for a quote or proposition that either does not appear or has been stretched far beyond reasonable bounds. After spending countless hours re-reading a six-year record with hundreds of filings and exhibits to cite-check both parties, the court will clamp down on the issue going forward.

But the Third Circuit has. In *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 486 (3rd. Cir. 2018), the Court rejected two ADA plaintiffs' reliance on census data and "common sense" to prove that the requisite number of mobility disabled persons visited Steak 'n Shake. The Third Circuit maintained its previous position that "where a putative class is some subset of a larger pool, the trial court may not infer numerosity from the number in the larger pool alone." *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 358 (3rd Cir. 2013)). In doing so, the Third Circuit cited with approval *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267-68 (11th Cir. 2009)—the most on-point opinion from the Eleventh Circuit.

Plaintiff Henry Vega wanted to certify a nationwide class action against T-Mobile for failing to pay required commissions. *Id.* at 1267. The district court rejected a nationwide class definition because of State-by-State contract variations destroying commonality, but it certified a narrower, Florida-only class definition. *Id.* Among other errors, the Eleventh Circuit found that the district court abused its discretion when it found that the plaintiff satisfied numerosity by pointing to deposition testimony that, ***nationwide***, T-Mobile employed sales associates "in the thousands." *Id.* As you'll notice from the highlighted portions of the block quote below, the Circuit's concern was that Vega provided no evidence about the number of ***Florida*** employees, the only relevant number under the revised class definition:

> Vega, in his class certification motion, cited only the deposition testimony of William Steele, T–Mobile's Manager of Sales Compensation Design, in support of his argument for numerosity. In his testimony, Steele agreed that the number of retail sales associates employed by T–Mobile between the years 2002 and 2006 was 'in the thousands.' While this company-wide testimony easily would constitute a sufficient basis for a finding of numerosity as it relates to a nationwide class, the district court, significantly, certified a Florida-only class. We have noted that, '[a]lthough mere allegations of numerosity are insufficient to meet this prerequisite, a plaintiff need not show the precise number of members in the class.' *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir.1983). Nevertheless, a plaintiff still bears the burden of

making some showing, affording the district court the means to make a supported factual finding, that the class actually certified meets the numerosity requirement. ==Vega has not cited, and we cannot locate in the record, any evidence whatsoever (or even an allegation) of the number of retail sales associates T–Mobile employed during the class period in Florida== who would comprise the membership of the class, as certified by the district court.

Yes, T–Mobile is a large company, with many retail outlets, and, as such, it might be tempting to assume that the number of retail sales associates the company employed in Florida during the relevant period can overcome the generally low hurdle presented by Rule 23(a)(1). However, a plaintiff still bears the burden of establishing every element of Rule 23, *see Valley Drug*, 350 F.3d at 1187, and a district court's factual findings must find support in the evidence before it. In this case, ==the district court's inference of numerosity for a Florida-only class without the aid of a shred of Florida-only evidence was an exercise in sheer speculation==. Accordingly, the district court abused its discretion by finding the numerosity requirement to be satisfied with respect to a Florida-only class when ==the record is utterly devoid of any showing that the certified class of T–Mobile sales representatives 'in Florida'== is 'so numerous that joinder of all members is impracticable.' Fed. R. Civ. P. 23(a)(1).

*Id.* at 1267-68 (highlight added). Again, the court highlights the Circuit's repeated mention of "Florida-only" and "in Florida" because it casts doubt on the Third Circuit's citation of *Vega* for the proposition that courts cannot infer numerosity from the large number of persons in the potential class pool. The district court erred in *Vega* because it was counting in the wrong pool—*i.e.*, national, not Florida. That's why the Court followed up its restatement of precedent that "a plaintiff need not show the precise number of members in the class," with "[n]evertheless, a plaintiff still bears the burden of making some showing . . . that *the class actually certified* meets the numerosity requirement." *Id.* at 1267 (emphasis added).

3. <u>Discussion</u>: Most courts make common sense assumptions when analyzing numerosity. *See* NEWBURG ON CLASS ACTIONS § 3:13 ("Generally, a plaintiff must show enough evidence of the class's size to enable the court to make commonsense assumptions regarding the number of putative class members."). The Eleventh Circuit has not forbidden district courts from making common-sense assumptions when analyzing numerosity. To the contrary, the Fifth Circuit's use of "common sense assumptions" to find numerosity in *Zeidman* predates the Eleventh Circuit's creation, and *Zeidman* has not been overruled or questioned by the Eleventh Circuit, making it binding on district courts. *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). So the court will make a common-sense assumption here.

Based on the testimonial evidence (including declarations) that at least 12 persons fit within the proposed class definition (doc. 167-85), plus Plaintiffs' statistical evidence that another 800,000+ persons who use a wheelchair or scooter live in an area with a Circle K (docs 81-3; 155-1), the court finds that Plaintiffs have met their burden to show that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). The court finds joinder particularly impracticable here, where known putative class members who live in Michigan, Illinois, Ohio, and Arkansas (at least) would have to travel to Anniston, Alabama, if joinder was chosen over class litigation.

## B. Commonality (Rule 23(a)(2))

Rule 23(a)(2) requires Plaintiffs to show that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). While the rule's plain language focuses on common "questions," the Supreme Court has held that common *answers* are what matters:

> What matters to class certification … is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Dukes*, 564 U.S. at 351 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

As explained below, Plaintiffs fail to show commonality because, as the Supreme Court put it, "[d]issimilarities within the proposed class . . . impede the generation of common answers." *Id.* Refurbished Circle K stores are like snowflakes; no two are exactly alike. Even if Class Representative Bob Lujano proves that a Schaerer coffee machine in Birmingham constitutes an architectural barrier that can be readily removed; that does not prove or drive toward resolution absent class member Shelly Loose's claim that a Schaerer coffee machine in Byron Center, Michigan, constitutes an architectural barrier that can be readily removed. Put differently, because Circle K does not have a nationwide corporate policy that governs the placement and reach range of Schaerer coffee machines, a Lujano-focused class action trial would not provide a common answer that helps resolve absent class members' cases. The absent members would still need their own trials, based on their own sets of facts.

### 1. Precedent

A deeper look into *Dukes*, Eleventh Circuit, and Third Circuit precedent reveals why Circle K's (a) lack of a corporate policy and (b) delegation of authority to the regional and store level precludes commonality here.

1. *Walmart v. Dukes (SCOTUS)*: *Dukes* was a Title VII case, focused on Walmart's treatment of three female employees who wanted to represent a class of 1.5 million. Plaintiff Dukes alleged that she was disciplined more harshly than her male counterparts, who also made more money than she did. Plaintiff Kwapnoski claimed that her male manager yelled at her but not her male counterparts. Plaintiff Arana alleged that she was passed over for a promotion because she was female and was then fired for violating timekeeping policy. None of the three named Plaintiffs worked at the same store.

Plaintiffs, who the court will call "Dukes" from now on, admitted that Walmart had no "express corporate policy against the advancement of women." *Dukes*, 564 U.S. at 344. Dukes argued instead that Walmart's delegation of authority to local managers to decide salaries and promotions led to a disparate impact against female employees, in violation of 42 U.S.C. § 2000e-2(k). And because Walmart knew that its delegation of authority was causing women to be disparately impacted, Dukes claimed that Walmart was disparately

treating women in violation of 42 U.S.C. § 2000e-2(a). The Court described Dukes' commonality argument like this:

> Importantly for our purposes, respondents claim that the discrimination to which they have been subjected is common to all Wal–Mart's female employees. The basic theory of their case is that a strong and uniform "corporate culture" permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice. Respondents therefore wish to litigate the Title VII claims of all female employees at Wal–Mart's stores in a nationwide class action.

*Id.* at 345. The district court found this argument established commonality, and a divided Ninth Circuit agreed. The Supreme Court reversed.

The Court started by noting the natural gap between (a) proving that **one** person was discriminated against and (b) proving that an **entire class** of persons "suffered the same injury" to the point that the individual and class claims share common questions of law or fact. *Id.* at 352-53 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58 (1982)). That gap must be closed by some corporate policy that ties the individual to the class. *Id.* at 353-55.

Again, Dukes claimed that Walmart's discriminatory corporate policy was "*allowing discretion* by local supervisors over employment matters." *Id.* at 355. The Court noted:

> On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices. It is also a very common and presumptively reasonable way of doing business—one that we have said 'should itself raise no inference of discriminatory conduct.'

*Id.* at 355 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988)). The Court noted that perhaps, "in appropriate cases," such delegation could be the basis of an individual's disparate impact claim. *Dukes*, 564 U.S. at 355. But

the fact that one or many individuals could raise a disparate impact claim "does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common." *Id.* Important here, the Court noted, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions." *Id.* at 355-56.

The Court then rejected the argument that statistics could provide the common answer. Even if statistics for all of Walmart's stores differed from national statistics for other stores, local store managers could argue that local differences in "the availability of women, or qualified women, or interested women" differed from the national average, thus negating the inference of discrimination. *Id.* at 357. In other words, store-by-store evidence could negate the commonality of national statistics—meaning that store-by-store trials would be needed. The same was true of anecdotes. Dukes provided 120 affidavits relating to 235 Walmart stores. *Id.* at 358. The Court said, "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company 'operates under a general policy of discrimination,' which is what [Dukes] must show to certify a companywide class." *Dukes*, 564 U.S. at 358 (quoting *Falcon*, 457 U.S. at 159).

The Court summed it up by noting that, thanks to the differences among the individual plaintiffs, store policies, and individual managers' personalities, the putative class had "little in common but their sex and this lawsuit." *Id.* at 359-60. So commonality could not be met.

2. *Vega v. T-Mobile (CA11)*: As mentioned, Vega brought a Florida-only class action against T-Mobile for charging back commissions paid to sales associates. Vega raised two claims: (1) breach of contract / unpaid wages and (2) unjust enrichment.

To review commonality for breach of contract, the Eleventh Circuit started by listing the elements Vega (and the class) would have to prove:

> (1) existence of a contract, which requires:
>> a. offer,
>> b. acceptance,

   c. consideration, and,
   d. sufficient specification of essential terms;
  (2) material breach of that contract;
  (3) resulting damages.

*Vega*, 564 F.3d at 1272. The Court found that Vega could not prove commonality because he failed to plead in his complaint a common contract among class members. *Id.* Without a common contract, Vega's trial could offer no common answer on mandatory elements like offer, acceptance, consideration, and essential terms.

> Instead, these mandatory elements of each class member's claim depend on such individualized facts and circumstances as when a given employee was hired, what the employee was told (and agreed to) with respect to compensation rules and procedures at the time of hiring, the employee's subjective understanding of how he would be compensated and the circumstances under which his compensation might be subject to charge backs, and when and how any pertinent part of the employee's compensation agreement or understanding thereof may have changed during the course of that employee's tenure at T–Mobile. Without the existence of a common contract, of course, there can also be no commonality with respect to whether T–Mobile's conduct relating to commission charge backs, even if undertaken pursuant to a uniform policy, constituted a breach of every class member's particular employment contract, whether any such breach was material for every class member, or whether each class member suffered cognizable damages as a result.

*Id.*

  The Court likewise rejected commonality for Vega's unjust enrichment claim. While Vega alleged that T-Mobile did not tell him that his commissions were subject to charge back if customers abandoned their service plans, T-Mobile offered affidavits from other employees who were "well-versed in T-Mobile's procedures." *Id.* at 1274-75. That meant the fact question of whether T-Mobile "unjustly" charged back commissions—an essential element of the

claim—would be subject to "uncommon and individualized" proof that could result in uncommon answers. So commonality could not exist.

3. *Ollie's Bargain Outlet (CA3)*: The Third Circuit dealt with a similar case to this one in *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890 (3rd Cir. 2022). Ollie's operates over 400 retail stores across 29 states. Plaintiffs Allen and Mullen ("Allen") have mobility disabilities that require them to use wheelchairs. Allen shopped at two Ollie's in Pennsylvania, both of which cluttered the aisles with goods that blocked Allen's path. Suspecting a pattern, Allen hired investigators to take measurements and pictures. Allen then sued Ollie's under the same theories Plaintiffs raise here: the failure to remove architectural barriers, in violation of 42 U.S.C. § 12182(b)(2)(A)(iv), and the failure to make reasonable modifications in policies, practices, or procedures, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii).

The district court certified this class: "All persons with qualified mobility disabilities who have attempted, or will attempt, to access the interior of any store owned or operated by [Ollie's] within the United States and have, or will have, experienced access barriers in interior paths of travel." *Id.* at 894. The district court found commonality because, in its opinion, "if Ollie's policies and procedures do, in fact, cause access barriers to unlawfully restrict individuals with disabilities from obtaining their desired goods, then proposed members who endured violations have suffered the same injury, the resolution of which will resolve a central issue in one fell stroke." *Id.* at 901.

The Third Circuit reversed. As for commonality, the Circuit Court started by noting that the district court begged the common answer to its own question—*i.e.* If Plaintiffs can prove that a common policy caused the aisles to be too cluttered, then Plaintiffs can show commonality. *Id.* As the Circuit pointed out, "posing a hypothetical question is not enough to satisfy plaintiffs' burden of proof." *Id.* Plaintiffs must sufficiently prove the common policy *before* they're entitled to certification under Rule 23; courts cannot grant certification so Plaintiffs can prove commonality later.

The Court then found Allen had not proved Ollie's had a common policy that would lead to a common answer during a class action trial. Like most large retailers, Ollie's had general policies that required adequate space for wheelchair passage and a program that required stores to retrieve goods for

patrons that could not reach them. *Id.* Like Walmart in *Dukes* (and like Circle K here), Ollie's then left it up to local stores to place goods in the aisles while maintaining adequate paths of travel for wheelchair users. *Allen*, 37 F.4th at 901.

Knowing that he needed a corporate policy, Allen pointed to Ollie's "visual store standard," which Allen argued led to local stores nationwide placing too many goods in aisle space so customers would see them. The Circuit responded: "Perhaps." *Id.* at 902. The Circuit noted that, to prove commonality, Allen had to show that the visual store policy led to stores nationwide—because the court certified a nationwide class—placing so many items in the aisle as to create an architectural barrier. *Id.* The Circuit found that Allen's photographs from the Pennsylvania stores, plus emails from 12 customers complaining about inaccessible aisles could not show that the national "visual store standard" caused a national problem. *Id.*

—

In sum, these cases provide three key points:

1. To establish commonality, Plaintiffs must point to a corporate policy that applied to all class members, thus causing their common injury;
2. The corporate policy cannot be the delegation of authority to regional or store managers if the delegation leads to different decisions and results in different locations; and,
3. A corporate delegation policy could theoretically support commonality if Plaintiffs prove (at the certification stage) that delegation impacts all class members the same way. But anecdotal evidence and statistics are not enough to meet Plaintiffs' burden of proof.

The court now applies these commonality principles to Plaintiffs' lone remaining count (Count I) and their evidence.

### 2. Commonality under Count I

Redacting the paragraph that deals with barriers other than Schaerer Coffee machines, and thus fall outside the proposed class, Count I alleges:

> **COUNT I**
> **(Failure to remove architectural barriers)**

155. Defendants created a common architectural barrier at their stores when they improperly installed the Schaerer Coffee Art machines with operable parts that did not comply with the reach range requirements of the 2010 Standards. Defendants created this common architectural barrier over a five-year period, and has refused to take action to correct or remove this barrier.

156. REDACTED

157. Furthermore, the architectural barriers described above demonstrate that Defendants have failed to remove barriers, as required by 42 U.S.C. § 12182(b)(2)(A)(iv); 42 U.S.C. § 12181(9); 28 C.F.R. § 36.304.

158. By continuing to operate the Subject Premises with discriminatory conditions in violation of the ADA, Defendant contributes to Plaintiff's sense of isolation and segregation and deprives Plaintiff of the full and equal enjoyment of the goods, services, facilities, privileges, and accommodations available to able-bodied individuals of the general public. The Named Plaintiffs and the Class continue to suffer discrimination because of the existence of these architectural barriers.

(Doc. 155, ¶¶ 155-58). Plaintiffs pleaded the corporate policies they allege led to these architectural barriers in Count II. (*Id.*, ¶¶ 159-63). The court redacts the 'path-of-travel policy' related to the now-dismissed Count III (*id.*, ¶¶ 164-68), leaving us with the corporate policies Plaintiffs say caused the common barriers alleged in Count I:

159. Defendants have utilized policies, practices, and procedures that have resulted in the creation of architectural barriers that have caused discrimination to the Named Plaintiffs and the Class.

160. On information and belief, Defendants have engaged in an unwritten general policy of discrimination, and/or have employed a company-wide policy of noncompliance with the ADA that has resulted in discrimination to the Named Plaintiffs and the Class.

> 161. REDACTED
>
> 162. On information and belief, Defendants' procedure of relying upon the manufacturer of the Schaerer Coffee Art machines to hire third-party contractors to install those machines has led to the creation of a common architectural barrier.

(*Id.*, ¶¶ 159-62). As shown, Count I pleads a claim under 42 U.S.C § 12182(b)(2)(iv), which forbids existing facilities from "fail[ing] to remove architectural barriers . . . where such removal is readily achievable." A 'failure to remove' claim has two elements: (a) "an architectural barrier exists" and (b) "the proposed method of architectural barrier removal is 'readily achievable.'" *Gathright-Dietrich v. Atlanta Landmarks, Inc., Inc.*, 452 F.3d 1269, 1273 (11th Cir. 2006).

Below, the court discusses three distinct but related reasons why Plaintiffs cannot prove commonality: (1) the Supreme Court has rejected the argument that a corporate policy delegating authority to make decisions to the local level provides a common answer; (2) Plaintiffs' proof of an "architectural barrier" will not provide a common answer; and, (3) Circle K's affirmative defense of "not readily achievable" will not provide a common answer.

1. <u>Corporate Policy</u>: Like Dukes against Walmart (Supreme Court), and Allen against Ollie's (Third Circuit), Plaintiffs rely on Circle K's corporate policy of delegating the decision of whether to install Schaerer machines to local business units, and the decisions of how to install Schaerer machines to Schaerer and its third-party contractors. (Doc. 155, ¶ 162). Again, the Supreme Court rejected this 'delegation as policy' argument:

> On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices. It is also a very common and presumptively reasonable way of doing business—one that we have said 'should itself raise no inference of discriminatory conduct.'

*Dukes*, 564 U.S. at 355 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988)). Like Walmart, Circle K has a corporate policy "against having

uniform [installation] practices." *Id*. So this court must reach the same conclusion as the Supreme Court in *Dukes*: Circle K's delegation policy "is just the opposite of a uniform [] practice that would provide the commonality needed for a class action[.]" *Id*.

Plaintiffs' reliance on Circle K's "unwritten general policy of discrimination" also fails. (Doc. 155, ¶ 160). An unwritten policy is not a policy unless Plaintiffs can prove it was transmitted by some other means from corporate down to the local level. Plaintiffs do not allege that, much less prove it. Instead, they ask the court to accept the same ethereal, "corporate culture" that the lower courts accepted, and the Supreme Court rejected, in *Dukes*:

> The basic theory of their case is that a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal–Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice.

*Dukes,* 564 U.S. at 345. Again, this court must follow the Supreme Court and find that Plaintiffs cannot rely on an unwritten, subconscious "corporate culture" as the nationwide corporate policy that drove decisions about where local store managers would place coffee machines.

Finally, Plaintiffs offer insufficient statistical and anecdotal evidence to support an inference that the delegation of authority or a corporate culture of discrimination provides the common answer to why local Circle K stores placed Schaerer coffee machines out of reach range. As for anecdotal evidence, as mentioned, Plaintiffs offer testimonial evidence of 12 persons who encountered an alleged coffee machine barrier (two by deposition; 10 by declaration). (*See* Doc. 167-85). As for statistics, Plaintiffs do not list a final number of stores and machines Plaintiffs' counsel and their experts visited in their briefs, but it does not appear to be 100 of the 7,000+ stores with 14,500 Schaerer machines they claim exist nationwide. In *Dukes*, Class Plaintiffs offered 120 affidavits that related to 235 of Walmart's 3,400 stores. Here, Plaintiffs offer far fewer affidavits related to far fewer Circle K stores, despite there being more Circle K stores nationwide than Walmart stores. If Dukes' statistical and anecdotal

evidence was "too weak to raise any inference that all the individual, discretionary personnel decisions [were] discriminatory," *Dukes,* 564 U.S. at 357-58, then Plaintiffs' statistical and anecdotal evidence is also too weak to raise an inference that all of Circle K's local decisions about coffee machines were discriminatory. *See also Allen*, 37 F.4th at 902 (analyzing *Dukes* and finding that "less than a dozen email anecdotes over four years, from a corporation [Ollie's] with over four hundred stores in twenty-nine states and thousands of employees exercising discretion, 'prove nothing at all').

2. Architectural barrier (first element): Corporate policy aside, at trial, Plaintiffs must first prove that the Schaerer coffee machine in his or her Circle K constitutes an "architectural barrier." The ADA doesn't define "architectural barrier." But the ADA does require the Attorney General to issue governing regulations, 42 U.S.C. § 12186, so courts look to the U.S. Department of Justice's ADA Guide for Small Businesses, which defines "architectural barriers" as:

> [P]hysical features that limit or prevent people with disabilities from obtaining the goods or services that are offered. They can include parking spaces that are too narrow to accommodate people who use wheelchairs; a step or steps at the entrance or to part of the selling space of a store; round doorknobs or door hardware that is difficult to grasp; aisles that are too narrow for a person using a wheelchair, electric scooter, or a walker; a high counter or narrow checkout aisles at a cash register, and fixed tables in eating areas that are too low to accommodate a person using a wheelchair or that have fixed seats that prevent a person using a wheelchair from pulling under the table.

*Mielo*, 897 F.3d at 477 (quoting ADA GUIDE FOR SMALL BUSINESSES at 3, (Dep't of Justice 1999)).

Plaintiffs argue that they can prove an architectural barrier by showing that the operable buttons on a Schaerer machine is out of the 48" reach range set out by the 2010 ADAAG Standards. (Doc. 168 at 8-9). Let's assume that true. Thanks to the variations among Circle K stores, Plaintiffs still must prove whether the operable buttons at an individual store exceed 48 inches—a

showing made by determining whether the countertop exceeds 30 inches. As a reminder, here are some countertop variations the parties encountered:



(*See* Docs. 167-11, 167-12, 167-28, 170-1). While the court has little doubt that the parties cherry-picked their examples, it's still telling that Defendants submitted pictures of four countertops equal to or less than 30-inches tall:





(Doc. 170-1). While it's impossible to say what percentage of Circle K countertops are 30 inches or less in height, these pictures suggest two things: (1) it would take a store-by-store analysis of thousands of Circle K stores to determine what percentage of Circle K stores present an architectural barrier; and, (2) if these countertops comply with the 2010 Standards because the local manager or business unit replaced them, as Plaintiffs suggest, then it's unlikely that Circle K's has an unwritten corporate policy of ADA discrimination that has seeped down to the local level. Either way, the court finds that the requisite case-by-case analysis of architectural barriers means that class action litigation in Alabama would not provide a common answer.

3. <u>Readily achievable</u>: If a Plaintiff proves that a coffee machine is an architectural barrier, then the question becomes whether removal of that barrier is "readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv); *Gathright-Dietrich*, 452 F.3d at 1273-74. Unlike architectural barrier, the ADA defines readily achievable:

> **(9) Readily achievable**
>
> The term "readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. In

> determining whether an action is readily achievable, factors to be considered include--
>
> (A) the nature and cost of the action needed under this chapter;
>
> (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;
>
> (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12181(9).

Whether a barrier removal is readily achievable is a fact-intensive, burden-shifting question that typically becomes the focus of barrier removal litigation. *Norkuna v. Seahorse NB, LLC,* 444 Fed. App'x 412, 417 (11th Cir. 2011) (explaining the burden shifting standard and judging sufficiency of the evidence under it).

The "nature and cost" of barrier removal, 48 U.S.C. § 12181(9)(A), for example, will vary based on many factors like store layout and geographic location. The evidence suggests that Circle K store layouts vary even more than countertop heights:



AS-BUILT FLOOR PLAN
SCALE: 1/8"=1'-0"          5,940 GSF

(Doc. 170-10) (layouts of stores Plaintiffs visited). If Defendants can show that removal is not readily achievable, then Defendants can offer alternative accommodations like "retrieving merchandise from inaccessible shelves and racks." 28 C.F.R. § 36.305(b)(2).

—

In sum, Plaintiffs' inability to point to a corporate policy that caused a nationwide set of architectural barriers, plus the fact-intensive nature of Plaintiffs' individual cases because of Circle K's diverse layouts, means that Plaintiffs fail to prove commonality.

### 3. Plaintiffs' Common Questions

When the court allowed Plaintiffs to propose the narrower, coffee-only class now at issue, the court required Plaintiffs to list the questions of law or fact that would be common to the class and satisfy Rule 23(a)(2) and *Dukes*. Plaintiffs submitted eight. (Doc. 194 at 5-6). The court reviews these questions to determine whether the court's holding that Plaintiffs cannot show a common question that produces the requisite common answer is correct.

> (1) Beginning in 2018 up through the present, did the Defendants have or engage in an unofficial policy of disregarding the reach range requirements for operable parts, contained in §§308 and 309.2 of the 2010 Standards, when they installed the SCAMs in their company[-]owned locations?

By focusing on an "unofficial policy of disregarding," Plaintiffs beg the answer, "Circle K did not have an official corporate policy." As explained, the Supreme Court rejected Duke's reliance on an unwritten, unofficial Walmart policy as providing the common answer needed to establish commonality when Dukes admitted Walmart had no official policy. *See Dukes*, 564 U.S. at 344-45.

> (2) Beginning in 2018 up through the present, did the Defendants have or engage in a practice of disregarding the reach range requirements for operable parts, contained in §§308 and 309.2 of the 2010 Standards, when they installed the SCAMs in their company[-]owned locations?

This is the same question, except it substitutes "unofficial policy" for "practice." This question begs the same answer, "Circle K did not have an official corporate policy." As explained, the Supreme Court rejected Duke's reliance on an unwritten, unofficial Walmart policy as providing the common answer needed to establish commonality when Dukes admitted Walmart had no official policy. *See id.* at 344-45. As also explained, Plaintiffs submit too little evidence to prove a nationwide practice.

> (3) Beginning in 2018 up through the present, did the Defendants' installation of SCAMs that disregarded the reach range requirements for operable parts contained in §§308 and 309.2 of the 2010 Standards, create a common architectural barrier for purposes of the ADA?

The question is based on a faulty premise; Plaintiffs' facts show that (a) Circle K left it up to regional business units and local stores to decide how and whether to install Schaerer machines and (b) left it up to Schaerer and its contractors, not Defendants, to install the Schaerer machines. Again, the Supreme Court rejected Duke's reliance on delegation of authority as proof of commonality. *See id.* at 355-56. When it did, the Court noted, "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions." *Id.* The same is true here in the ADA context.

> (4) Did the Defendants' policy, practice, or procedure of relying upon Schaerer to install the SCAMs lead to the creation of the common architectural barrier?

The question begs the same answer as Question #3. So the court rejects it as providing the requisite common answer for the same reason—*i.e.*, the Supreme Court rejected delegation of authority as a policy that proves commonality.

> (5) Did the Defendants' installation of SCAMs, in replacement of the existing drip coffee brewers at their locations, constitute an "alteration" as that term is understood for purposes of 28 C.F.R. § 36.402(b)?

> (6) When installing the SCAMs, did Defendants disregard 28 C.F.R. 36.402(a)(1) which requires that any alteration "be made so as to ensure that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs?

> (7) If the "alteration" occurred in an "area of primary function," did 28 C.F.R. 36.403 require Defendants to undertake separate "path of travel" remediation obligations that they never performed?

Alterations in an area of primary function trigger 'path of travel' remediation obligations subject to Plaintiffs' Counts II and III. (Doc. 155, ¶¶ 159-68). But the court has dismissed those counts (docs. 201, 202), and these questions are not relevant to the single 'failure to remove a barrier' count remaining. So these questions beg a common answer that cannot drive the litigation toward resolution.

> (8) Are the Defendants' assertions of "alternative accommodation" or "equivalent facilitation," a defense under the ADA for disregarding the reach range requirements for operable parts of the 2010 Standards when installing SCAMs?

The Code of Federal Regulations provide that, if a public accommodation like Circle K cannot readily achieve removal of a barrier, then it must make its goods and services available though "alternative methods" like retrieving merchandise from an inaccessible shelf that cannot be lowered. 28 C.F.R. § 36.305(b)(2). Defendants mention this Regulation in their opposition brief:

> Even if the operating controls of a machine are higher than 48 inches <u>and</u> a customer has difficulty obtaining a cup of coffee, Circle K employees are trained to assist customers including those with disabilities. This type of customer assistance is an alternative to barrier removal. *See* 28 C.F.R. § 36.305(b)(2). It is for this reason that Lujano admitted that a public accommodation like Circle K does not violate the ADA when it provides an alternative accommodation, such as assisting customers with items (like coffee). Ex. 5, Lujano Tr. at 24:7-18, 37:10-16. Therefore, examining Defendants' alternative accommodation defense— which includes whether customer assistance was available at a particular store and whether a putative class member received it— requires an individualized inquiry and is not suitable for classwide resolution.

(Doc. 169 at 21). Plaintiffs raise an interesting question: Does this Regulation provide a trial defense (as Defendants suggest), or a post-trial obligation that arises only after Defendants prove at trial that barrier removal was not readily achievable—an obligation that results in a distinct ADA violation if not followed. *See* 42 U.S.C. § 12182(b)(2)(A)(v).

While interesting, this question does not render a common answer that satisfies Plaintiffs' Rule 23(a)(2) burden. For starters, Plaintiffs do not plead in their operative complaint (doc. 155), nor have they proved with evidence after certification discovery, that Circle K had a *corporate* policy that regional business units and local stores could disregard the 2010 ADAAG standards, or any other ADA-related laws and regulations, as long as they complied with 28 C.F.R. § 36.305(b)(2). Again, Plaintiffs have a burden of proving that Rule 23(a)(2) is "*in fact* satisfied." *Brown*, 817 F.3d at 1234.

Further, Plaintiffs' evidence shows that Circle K delegated decisions like the placement of coffee machines to the regional business units and local store managers. (*See* Doc. 167). Proving that regional and local managers relied on associates to help mobility disabled persons make coffee, to avoid the cost of lowering their store's coffee counter, is a case-by-case question that will result in case-by-case results—not a common answer that drives this litigation toward resolution.

—

To sum up, the court finds that (a) Circle K's delegation of authority over coffee machine decisions to the local level and (b) the variations among Circle K store layouts and countertop heights prevents the putative class action from providing a common answer that drives resolution of all or a significant number of the putative class members' claims. Rather, the court would need to hold a series of mini-trials to deal with the variations.

The same issues often prevent class actions against places of public accommodation. Since *Dukes*, other district courts have similarly found that commonality did not exist when faced with similar facts—*i.e.*, allegations that stores or restaurants with various layouts violated ADA laws protecting persons with mobility disabilities. *See, e.g.*, *Wagner v. White Castle*, 309 F.R.D. 425 (S.D. Ohio 2015) (commonality not met because of variations among White Castle restaurants); *Mielo v. Bob Evans Farms, Inc.*, 2015 WL 1299815 (W.D. Pa. Mar. 23, 2015) (commonality not met because of variations among Bob Evans' parking lots); *Castaneda v. Burger King Corp.*, 264 F.R.D. 557, 567 (N.D. Cal. 2009) (commonality not met because of various designs of Burger King restaurants and lack of an affirmative centralized plan that caused the alleged barriers).

Because Plaintiffs fail to meet their burden of proving commonality, and the court has serious doubt that they can thanks to Circle K's delegation of authority and widely varied store designs, the court cannot certify the proposed class for failure to satisfy Rule 23(a)(2).

### C. Typicality (Rule 23(a)(3))

Rule 23(a)(3) requires proof that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). While commonality focuses on claims, and how the class members' claims relate, typicality focuses on the individual class representative: Is this individual's claim similar enough to the absent class members' claims to make him a proper 'champion' of the class?

While commonality and typicality are distinct inquiries, generally, "there can be no typicality where commonality is lacking." NEWBURG ON CLASS

ACTIONS § 3:31. Logic dictates that if the class representative's trial cannot produce a common answer that drives resolution of absent class members' claims (*i.e.*, commonality), then his claims or the defenses to his claims are not sufficiently similar to his absent classmates (*i.e.*, typicality). For example, in *Vega*, the Eleventh Circuit found that because no common contract tied Vega's claims to the claims of absent class members (*i.e.*, no commonality), "it is impossible for Vega to bring a case typical of all other class members. Rather, the court would have to look to such individualized factors as each employee's individual contract, when he was hired, what he was told (and agreed to) at the time of hiring, his subjective understanding of how he would be compensated and when charge backs might occur, and when and how any material aspect of his agreement or understanding of the agreement may have changed during his employment with T–Mobile." *Vega*, 564 F.3d at 1276.

The same is true here. Variations among Circle K stores and individual Plaintiffs' experiences in those stores matter. How tall is the counter? When was the store built? (More on why that matters later.). Did an employee assist the Plaintiff?

These questions raise serious doubts about the typicality of the named Plaintiffs' claims—or any class member's claims. The court thus finds that Plaintiffs fail to meet their burden under Rule 23(a)(3).

### D. Adequacy of Representation (Rule 23(a)(4))

Rule 23(a)(4) requires proof that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). Like typicality, adequacy focuses on the individual class representative, this time focusing on whether his personal attributes (rather than his legal claims) make him a proper champion of the class.

Defendants challenge adequacy of representation by attacking Plaintiffs' counsel, not the class representatives. (Doc. 169 at 29-30). The court rejects Defendants' counsel-based argument for two reasons. First, by its plain language, Rule 23(a)(4) focuses on the adequacy of "the representative **parties**," while Rule 23(g)(4) looks at the adequacy of "[c]lass **counsel**." *Compare* FED. R. CIV. P. 23(a)(4) (emphasis added)*, with* FED. R. CIV. P. 23(g)(4)

(emphasis added). *See* NEWBURG ON CLASS ACTIONS § 3:52 (discussing the distinction between reviewing the adequacy of class representative and class counsel). Second, without judging counsel's adequacy under Rule 23(g)(1) and 23(g)(4), the court disagrees with Defendants' characterizations of Plaintiffs' counsel. While all attorneys could perform certain functions better, to date, Plaintiffs' counsel have performed zealously and professionally on behalf of their clients and the purported class.

The court does, however, have concerns about the adequacy of the four named class representatives now that Plaintiffs have just one claim (*i.e.*, failure to remove an architectural barrier), and they have narrowed the class to focus on self-serve coffee machines.

Only one of the four Plaintiffs drinks coffee. Plaintiff Harper has never drunk coffee and has not tried to buy coffee at Circle K. (Doc. 167-24 at 49-50).

Plaintiff Weldon does not drink coffee (doc. 167-22 at 18) but has tried to buy it for his fiancée (*id.* at 89-90). While Weldon testified that the buttons were too high to reach (*id.*), he also testified and demonstrated that he could reach a coffee machine that was "55 inches or lower." (*Id.* at 91-92). So Defendants have attacked his individual standing and injury.

Plaintiff Moody testified that he had to get help with coffee (doc. 167-23 at 180-81) and that the machines were set too far back to reach (*id.* at 231). But Moody's deposition testimony was at times inconsistent; he never directly testified that a Circle K coffee machine was too high or tall; and he and defense counsel consistently talked past each other. Plus, Moody demonstrated that he could reach 51.5 inches. (*Id.* at 163).

Plaintiff Lujano signed a declaration that says he could not reach a Schaerer coffee machine. (Doc. 167-35 at 3). But at his deposition, Lujano testified that he doesn't drink coffee. (Doc. 167-25 at 67). And when asked to recall his experiences with Circle K coffee machines, Lujano couldn't recall *anything*, except that he doesn't drink coffee:

> Q.  Do you remember where the coffee machines were in the Auburn store or the 400 Springs Parkway store?

A.   I cannot recall.

Q.   Do you know if they even had coffee machines?

A.   I cannot recall.

Q.   So when you say you 'cannot recall,' are you saying you didn't try to use the coffee machines at those stores? Is that right?

A.   Yeah. I can't recall.

Q.   Okay. You don't recall whether or not you used the coffee machines at the -- the four Circle K stores?

A.   Yeah. I can't recall.

Q.   Okay. Did you ever take any measurements at any of these stores?

A.   I can't recall.

Q.   Do you know what the size of the counters are at any of these stores upon which the coffee machines are -- are located?

A.   No, I do not.

Q.   Do you know whether -- do you know the name of any of the coffee machines at any of these stores?

A.   I cannot recall.

Q.   Okay. Do you know if they're hooked up in any way, the coffee machines? Like, for example, let me -- do you know whether they're plugged in or whether they're more of like a pot brew coffee machine?

A.   I can't recall.

Q.   Okay. Do you know -- do you know if any of them have any touch screens?

> A.   I can't recall.
>
> Q.   Did you at any point try to touch the touch screens for the coffee? I know you said you don't drink coffee.
>
> A.   Yeah.
>
> Q.   But did you ever try to touch the touch screen on any of the coffee machines?
>
> A.   I can't recall.

(*Id.* at 108-10) (highlight added).

As you can see, all four Plaintiffs have some issue that casts doubt on his or her adequacy to be the class champion on a coffee machine-based claim. Particularly troubling is Lujano, who Plaintiffs asked the court to substitute in as a named Plaintiff so that he could present the Schaerer machine-based claim on behalf of the class. (*See* Doc. 112, ¶¶ 4-7). Yet under oath, Lujano could not—or would not—say that he tried to use a coffee machine or tried to reach the digital touch screen. (*See* Doc. 167-25 at 108-10). Because the court doubts that the four class representative adequately represent the currently defined class, the court finds that Plaintiffs fail to meet their burden of proof under Rule 23(a)(4).

### E. Ascertainability (implicit requirement)

On top of the four prerequisites explicitly listed in Rule 23(a), courts sometimes say that two more requirements are implicit: definiteness and class membership. *See* Newburg on Class Actions § 3.1. The Eleventh Circuit collapses these requirements into one inquiry its calls ascertainability, which requires Plaintiffs to establish that the class is "adequately defined such that its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).

Some courts say that a "fail safe" class—*i.e.,* a class "that references the merits of the case to determine class membership—destroys ascertainability. *See* Newburg on Class Actions § 3:6. But the Eleventh Circuit has yet to declare whether or not "fail safe" classes destroy ascertainability. *See id.*;

*Cordoba,* 942 F.3d at 1277 ("[T]he basic question we face is whether a district court should sort out the uninjured class members before granting class certification, or whether it can wait until a later stage in the proceeding to determine which class members have suffered a redressable injury and are entitled to relief and which are not. We do not hold today that a court is required to ensure that the class definition does not include any individuals who do not have standing before certifying a class. Such a rule would run the risk of promoting so-called 'fail-safe' classes, whose membership can only be determined after the entire case has been litigated and the court can determine who actually suffered an injury.").

If the Eleventh Circuit forbid fail-safe classes, then the court would find that Plaintiffs also fail to establish ascertainability. Here again is the revised class definition:

> All persons with mobility disabilities, who use wheelchairs or another similar assistive device because of a condition other than a temporary injury, including those with difficulty walking or climbing stairs, who have accessed a company owned Circle K location since November 6, 2018, and on the basis of their disability encountered the interior architectural barrier consisting of the Schaerer Coffee Art Machines and/or coffee condiments that were out of reach range, and were therefore allegedly denied full and equal access to the goods and services at that location under Title III of the ADA.
>
> Excluded from the Class are Defendants, any person, firm, trust, corporation or other entity affiliated with the Defendants, and members of the federal judiciary.

(Doc. 194) (highlight added). The highlighted portion of the definition references the merits of the case—*i.e.*, that the Schaerer coffee machine was out of reach range, making the machine an architectural barrier that Circle K failed to remove in violation of Title III of the ADA. That means the court cannot ascertain class membership without holding hearings or mini-trials.

That said, the Eleventh Circuit has not said that fail-safe classes destroy ascertainability. So the court finds that Plaintiffs plead a fail-safe class but

does not deny certification on this issue. Rather, the court denies certification for failure to satisfy the four explicit prerequisites of Rule 23(a).

—

To sum up Part 2, Plaintiffs fail to meet their burden of establishing three of Rule 23(a) prerequisites: commonality, typicality, and adequacy of representation. Because each of these failures is an adequate, independent ground to deny class certification, the court abstains from reviewing Rule 23(b)'s types of class action and Rule 23(g)'s requirements for appointment of class counsel because such review is unnecessary. *See generally Little v. T-Mobile*, 691 F.3d 1302, 1307 (11th Cir. 2021) (affirming denial of certification on the "independently adequate alternative grounds" of predominance, without reviewing district court's findings against numerosity and ascertainability). There is, however, one last finding the court must make.

### 3. Rule 23(f) & *Prado-Steiman*

Rule 23(f) allows Plaintiffs to seek interlocutory appeal from this order. The Circuit Court has set out five factors it considers when deciding whether to consider a Rule 23(f) appeal. *See Prado-Steiman*, 221 F.3d at 1274-77. In the last factor, the Court considers whether "future events may make immediate appellate review more or less appropriate." *Id.* at 1276. Under that factor, the Court has deemed it "significant . . . whether the district court itself has indicated that it views its class certification decision as conditional or subject to revision at a later stage in this case." *Id.*

This court does not consider this decision conditional or subject to revision. Unless Plaintiffs point to a legal error in a motion to reconsider, the court considers its decision to deny class certification final for two reasons.

1. <u>Time</u>: This case is six years and one week old. The court gave the parties more than two years to work on a settlement that ultimately failed. After that, the court gave the parties eight months for class certification discovery (doc. 71), then re-opened class certification discovery for another two and half months to allow Plaintiffs to focus on the Schaerer coffee machine claim addressed in this order (doc. 137). During that time, the court held three in-person hearings and six telephone conferences or hearings. Mindful that the

court is under a continuing obligation to reconsider its decision, *see* FED. R. CIV. P. 23(c)(1)(C), it is time to move beyond class certification.

2. <u>Futility</u>: The court also finds that a motion to reconsider or redefine the class would be futile. As explained, Plaintiffs fail to establish commonality because (a) Circle K delegates authority to the regional and store level, rather than governing by corporate policy, and (b) Circle K's business model results in variations among stores that requires a case-by-case, store-by-store analysis to determine ADA violations.

Neither problem will change. Circle K continues to delegate authority. And ACT continues to buy existing gas stations and convenience stores to re-brand as Circle K. For example, after class certification discovery closed, ACT finalized a deal to buy and re-brand 112 MAPCO convenience stores. *See* Press Release, Alimentation Couche-Tard, Inc., Alimentation Couche-Tard Announces the Closing of the Transaction with COPEC for MAPCO Express Inc. (Nov. 1, 2023).[5] Like other existing stores that ACT buys, MAPCOs come is various shapes and sizes, including the MAPCO "Store of the Future" design below that now carries the Circle K banner:



---



*See MAPCO opens first Sevierville location with latest store model,* KNOXVILLE DAILY SUN, May 6, 2021 (article about store pictured above).[6] This means there are dozens more variations of coffee counters, parking lots, paths of travel, etcetera, than the court considered in deciding this motion. More will surely come. And if history predicts the future, one or both parties will ask for another round of discovery to determine the impact newly-purchased stores have on this case.

If this court is right that variations in store designs, coffee machine heights, etcetera, preclude commonality, then Plaintiffs cannot plead around a problem that prevents class certification. That problem will only grow with time, and enough time has been given to class certification issues already. It's time to move on to the merits. So absent some legal error, the court does not see its decision to deny certification as subject to revision.

---

[6] Available at www.https://www.knoxvilledailysun.com /business/2021/mapco-sevierville-opens.html.

## CONCLUSION

For these reasons, the court **GRANTS** Plaintiffs' request to redefine the class definition (doc. 194) and **DENIES** Plaintiffs' renewed motion to certify the class, as redefined (doc. 168). The court will enter a separate order that carries out this ruling.

**DONE** and **ORDERED** on March 29, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE